## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| JILL BJORKLUND, MOLLIE JO BLAHUNKA, and PATRICK JOSEPH HURLEY II ("PJ"), | CASE NO. |
| **Plaintiffs,** | |
| v. | **COMPLAINT** |
| ANKENY COMMUNITY SCHOOL DISTRICT and JODIE GRAHAM, individually and in her official capacity, | **AND JURY DEMAND** |
| **Defendants.** | |

**COME NOW**, the Plaintiffs, Jill Bjorklund, Mollie Jo Blahunka, and PJ Hurley (Collectively "Plaintiffs"), by and through the undersigned attorneys, and for their cause of action and state as follows:

### INTRODUCTION

1.      This is an action brought under 42 U.S.C. § 1983 to hold the Ankeny Community School District and Jodie Graham responsible for their unreasonable, unlawful, and malicious violations of Plaintiffs' First Amendment free speech and association rights under the United States Constitution. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

2.      Jill Bjorklund, Mollie Jo Blahunka, and PJ Hurley are dedicated educators who strive to ensure every student receives a top-notch education and most importantly, feels safe at school while they learn. These teachers work tirelessly to provide students with support and opportunities both inside the classroom and through countless school activities outside the classroom.

3.      Jill Bjorklund, Mollie Jo Blahunka, and PJ Hurley's First Amendment rights to free speech and association were violated by the Ankeny Community School District (the "District") and Jodie Graham (together with the District, "Defendants") by disciplining Plaintiffs in retaliation for expressing their support for the students' participation in queer community affirming events at an after school, end-of-the-year party for the Gender Sexuality Alliance ("GSA") student club, and by prohibiting Plaintiffs from communicating with students, co-workers, and community members for several weeks following the event.

4.      The teachers attended the event either as invited guests of the students or pursuant to District policy, which requires club faculty sponsors to attend all organized club meetings and events.

5.      The GSA party was organized and run by the students themselves, all of whom were very proud of the hard work that went into planning a successful year-end event. During the party students—who voluntarily attended the celebration—ate ice cream, socialized, and had an opportunity to watch one of their own classmates perform in drag costume, as well as watch two other performers, close to their own age, who had recently participated in the Iowa Youth Pride Pageant. The celebration was a wonderful event that allowed the students to have safe discussions regarding identity and affirmed that every student is a valued human being. No one at the event was harmed or offended, nor was any educational purpose interrupted by any part of the event.

6.      None of the families of the students that attended the celebration voiced any issues with the event. However, members of the community learned of the event through social media and made false accusations that the GSA celebration involved a lewd, sexual performances and some statements even likened the performances to a strip show. In reality, the performances only

involved three young people, including a student, wearing dance costumes while performing choreographed dance numbers to Broadway and radio songs (*a/k/a* a drag show).

7.     Following baseless complaints from uninvolved community members, Ankeny Community School District pulled the three teachers out of their classrooms—in the middle of classes—and informed them that, due to their support of the queer students at Ankeny High School and Southview Middle School, they were under investigation.

8.     The District's actions and statements in the days following sent a clear message to student and staff member that statements (verbal or otherwise) made in support of LGBTQ+ students were unwelcome and would be actively discouraged by the District.

9.     The District also explicitly prohibited the teachers from speaking with students, parents, or their coworkers about anything—related to the GSA party or not—for weeks following the event, maliciously infringing on their rights to free speech and association.

10.     These investigations came after Ms. Bjorklund had made extensive complaints earlier in the school year to the administration that the GSA, and the students in the club, were being targeted by the administration and treated differently than any other student club.

11.     Although these investigations failed to reveal any improper conduct, the District's discipline of the teachers who did nothing more than affirm and support their LGBTQ+ students and their rights to be free from discrimination eviscerated the teachers' constitutional rights to free speech and association.

## JURISDICTION

12.     This Complaint seeks remedies pursuant to 42 U.S.C. § 1983, alleging violations of the First Amendment to the Constitution of the United States of America.

13.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. § 1331 because Plaintiffs' action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

14.     Venue is proper in the United State District Court for the Southern District of Iowa pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this District and the events giving rise to the claims occurred within this District.

## PARTIES

15.     Plaintiff Jill Bjorklund is a citizen and resident of Polk County, Iowa.

16.     Plaintiff Mollie Jo Blahunka is a citizen and resident of Polk County, Iowa.

17.     Plaintiff PJ Hurley is a citizen and resident of Polk County, Iowa.

18.     Defendant Ankeny Community School District is a public school district located in Polk County, Iowa.

19.     Defendant Jodie Graham is a citizen and resident of Polk County, Iowa and at all times material hereto, was the Executive Director of Human Resources for Ankeny Community School District in Ankeny, Iowa.

## FACTUAL ALLEGATIONS

**GSA Student Clubs**

20.     Ankeny Community School District allows students in grades seven through twelve to form noncurriculum student organizations, with meetings and activities planned by the students and supervised by a staff member of their school.

21.     "These clubs provide opportunities for youth to participate in activities, interact with peers in a supervised setting, and form relationships with adults. Some clubs focus on a specific area, thus allowing members to develop their skills and interests in that area." Ankeny

High School Activities and Clubs, https://hawks.ankenyschools.org/activities/ (last visited February 14, 2023).

22.     Ankeny High School and Southview Middle School both have a GSA student club.

23.     In May 2022, Ankeny High School GSA's faculty sponsor was Ms. Blahunka and Southview Middle School GSA's temporary faculty sponsor was Ms. Bjorklund because the club's regular staff sponsor was absent on maternity leave.

24.     The GSA clubs provide a supportive and inclusive environment for LGBTQ+ students and allies. This includes providing a space for students to celebrate queer culture and meet other students and adults that can help them navigate being a member of a group of protected individuals that have suffered discrimination and been denied access to equity in education, public accommodations, and in the workplace. Hoanglan Cardinal, *Creating Safe and Inclusive Schools for LGTBQ Students*, 13 BU J. of Grad. Studies in Educ., Issue 2 (2021) ("GSAs provide opportunities for LGTBQ students to form positive and supportive relationships with peers and staff, to have a sense of belonging, and to engage in social justice-based activities that challenge the hostile school environment through awareness campaigns." (citations omitted)), *available at* https://files.eric.ed.gov/fulltext/EJ1304398.pdf.

25.     LGBTQ+ is "[a]n acronym for 'lesbian, gay, bisexual, transgender and queer' with a '+' sign to recognize the limitless sexual orientations and gender identities used by members of [the LGBTQ+] community." Human Rights Campaign, *Glossary of Terms*, https://www.hrc.org/resources/glossary-of-terms (last visited Nov. 16, 2023).

26.     Having these student clubs and supporting these students is critically important in Ankeny in light of the fact that in the Spring 2022, only 56% of students in 6th through 12th grade in the District reported that they feel safe from physical harm at school; only 27% reported they

feel safe from verbal abuse, teasing, and exclusion at school. Ankeny Comm. Sch. Dist., *District Annual Goals: Safe & Welcoming Environment, 2022 Conditions of Learning Survey Results*.

27.    Additionally, only 41% of students in 6th through 12th grade reported that they believed the student-to-student relationships in the school were respectful and, even less, just 35% reported that they felt connected and supported by the adults in their school. *Id.*

## Safe & Welcoming Environment

Goal:  Increase the percentage of students in demographic groups reporting a safe and welcoming school environment as measured by local and state surveys.
(Spring 2021 & 2022 Conditions of Learning Survey* Results)

### Physical Safety
(The extent to which students feel safe from harm while on school property)

| | 3rd-5th Grades | | 6th-12th Grades | |
|---|---|---|---|---|
| | 2020-21 | 2021-22 | 2020-21 | 2021-22 |
| ACSD | 72% | 64% | 68% | 56% |
| Female | 78% | 66% | 73% | 61% |
| Male | 67% | 61% | 63% | 52% |
| Black or African American | 65% | 49% | 54% | 38% |
| Hispanic/Latino | 77% | 66% | 70% | 60% |
| Two or more races | 70% | 59% | 64% | 49% |
| White | 72% | 65% | 69% | 57% |
| Confidentiality protected | 85% | 60% | 62% | 57% |
| Low SES (FRL) | 68% | 53% | 58% | 50% |
| Not Low SES | 73% | 66% | 70% | 58% |
| Students with Disabilities (IEP) | 64% | 58% | 64% | 51% |
| Students without an IEP | 73% | 64% | 69% | 57% |
| English Learners (EL) | 71% | 58% | 59% | 66% |
| English Language Proficient | 72% | 64% | 69% | 56% |

### Emotional Safety
(The extent to which students feel safe from verbal abuse, teasing and exclusion.)

| | 3rd-5th Grades | | 6th-12th Grades | |
|---|---|---|---|---|
| | 2020-21 | 2021-22 | 2020-21 | 2021-22 |
| ACSD | 30% | 23% | 35% | 27% |
| Female | 33% | 22% | 32% | 26% |
| Male | 28% | 24% | 37% | 29% |
| Black or African American | 19% | 14% | 28% | 22% |
| Hispanic/Latino | 34% | 24% | 37% | 29% |
| Two or more races | 30% | 17% | 33% | 27% |
| White | 31% | 24% | 35% | 27% |
| Confidentiality protected | 32% | 14% | 33% | 28% |
| Low SES (FRL) | 24% | 18% | 29% | 22% |
| Not Low SES | 32% | 24% | 36% | 28% |
| Students with Disabilities (IEP) | 20% | 22% | 29% | 18% |
| Students without an IEP | 32% | 23% | 35% | 28% |
| English Learners (EL) | 20% | 14% | 29% | 25% |
| English Language Proficient | 31% | 23% | 35% | 27% |

### Student-Student Relationships
(The extent to which students demonstrate care and respect for, and collaborate with other students in their school)

| | 3rd-5th Grades | | 6th-12th Grades | |
|---|---|---|---|---|
| | 2020-21 | 2021-22 | 2020-21 | 2021-22 |
| ACSD | 91% | 90% | 51% | 41% |
| Female | 92% | 91% | 44% | 34% |
| Male | 90% | 88% | 58% | 48% |
| Black or African American | 91% | 76% | 43% | 35% |
| Hispanic/Latino | 91% | 88% | 49% | 39% |
| Two or more races | 89% | 88% | 49% | 29% |
| White | 91% | 90% | 52% | 42% |
| Confidentiality protected | 94% | 92% | 53% | 49% |
| Low SES (FRL) | 87% | 87% | 46% | 38% |
| Not Low SES | 92% | 90% | 52% | 42% |
| Students with Disabilities (IEP) | 85% | 86% | 55% | 46% |
| Students without an IEP | 92% | 90% | 51% | 41% |
| English Learners (EL) | 93% | 84% | 59% | 64% |
| English Language Proficient | 91% | 90% | 51% | 41% |

### Adult-Student Relationships
(The extent to which students feel connected to and supported by the adults in their school)

| | 3rd-5th Grades | | 6th-12th Grades | |
|---|---|---|---|---|
| | 2020-21 | 2021-22 | 2020-21 | 2021-22 |
| ACSD | 79% | 77% | 46% | 35% |
| Female | 82% | 82% | 43% | 31% |
| Male | 76% | 72% | 49% | 40% |
| Black or African American | 75% | 74% | 46% | 27% |
| Hispanic/Latino | 80% | 80% | 49% | 37% |
| Two or more races | 77% | 74% | 43% | 30% |
| White | 79% | 78% | 46% | 35% |
| Confidentiality protected | 77% | 76% | 49% | 47% |
| Low SES (FRL) | 78% | 76% | 48% | 38% |
| Not Low SES | 79% | 78% | 45% | 35% |
| Students with Disabilities (IEP) | 78% | 81% | 54% | 48% |
| Students without an IEP | 79% | 77% | 45% | 35% |
| English Learners (EL) | 81% | 79% | 65% | 67% |
| English Language Proficient | 79% | 77% | 46% | 35% |

*The state Conditions for Learning Survey reports the percent of students who respond positively to all items in each construct.

28.     The Plaintiffs Ms. Blahunka and Mr. Hurley, as openly queer staff members, and Ms. Bjorklund, as a vocal ally and parent of a LGBTQ+ student who attends Ankeny schools, have a profound understanding of the need to have supporting adults in school for all students, but in particular for LGBTQ+ students.

29.     Numerous studies have shown that having teachers that share in a student's identity or culture significantly improves educational outcomes, increasing graduation rates and the likelihood of attending post-secondary institutions, and many other benefits which extend long after a student completes primary and secondary education.

30.     As dedicated teachers, the Plaintiffs do all that they can to show LGBTQ+ students at Ankeny High School and Southview Middle School that they are capable, safe, and valued, including through their attendance and support of the GSA student club events, such as the youth drag show that was part of the club's end-of-the-year celebration on May 23, 2022.

**Drag Shows**

31.     Drag performances have a long history in entertainment, extending back at least as far as ancient Greece.

32.     Men and women have dressed in non-gender conforming costumes in performances throughout history; they continue to do so today.

33.     Modern and mainstream drag performers—like RuPaul—are featured on television and live entertainment shows throughout America.

34.     Drag performances are not inherently sexual or suggestive.

35.     Instead, drag performances are artistic expressions of gender identity.

36.     Indeed, there are youth drag shows specifically intended to be appropriate for children of all ages.

37.     All three performers involved in the GSA end-of-year celebration regularly perform at youth drag shows. *See, e.g.*, Des Moines Pride Fest: Drag Queen Story Time and Youth Drag Show, June 11, 2022, https://bit.ly/3z7rJ8B; Des Moines Arts Festival Public Stage Drag Show, June 26, 2022, https://bit.ly/3PZmONA; CelebrAsian, May 27, 2022, https://bit.ly/3cKREeL; The Garden in Des Moines, All Ages Drag Shows on March 20, 2022, https://bit.ly/3zzH1UU and July 17, 2022, https://bit.ly/3PVuXTh.

38.     Drag performances are closely connected with the LGBTQ+ community.

39.     Drag performances are not taboo in the LGTBQ+ community and are instead an accepted and celebrated part of the culture.

40.     It is customary at drag shows for members of the audience to show appreciation by handing the performers $1 (or sometimes larger denominations).

41.     Importantly, this is not done by placing the money on the performers' body, but rather by placing the money in the air and the performers take the tip from the audience member with their hands.

42.     This practice is commonly referred to as "tipping" in the context of a drag show.

43.     Tipping is part of the etiquette for attending a drag show.

44.     Tipping is a common and accepted practice in youth drag shows, just as it is common and accepted in adult ones.

45.     Indeed, some resources suggest that "tipping" is *mandatory* and that failure to tip a performer is rude.

46.     Put simply, handing a performer $1—or sometimes a larger denomination—is as normal in the context of a drag show as clapping or cheering are in other performance contexts.

47.     A student-performer, C.D., referenced the practice of "tipping" before the drag show began.

48.     C.D. informed the crowd that the three performers did not expect tips, although Mr. Hurley did not hear this announcement because he entered the auditorium after most of the students were seated.

**The Ankeny High School GSA Celebration**

49.     In March 2022, the students in the Ankeny High School GSA expressed that they wanted to do a joint end-of-the-school year celebration with other GSA student clubs in the District.

50.     The students expressed that they wanted to have a safe space to celebrate LGBTQ+ students and provide an opportunity for Southview GSA members to meet their peers at the high school as the ninth-grade students would be attending the high school the following school year.

51.     The high school students then started planning the celebration.

52.     The celebration was not publicized beyond discussions at GSA meetings to ensure that those in attendance wanted to be there and foster the students' desired safe space.

53.     In May 2022, Ms. Blahunka spoke with Activities Director Andy Umthun about the High School GSA students' desire to have a celebration at the end of the school year jointly with the Southview GSA club.

54.     Mr. Umthun expressed that he believed the joint celebration would be a good experience for all of the students and inquired about the location for the event.

55.     Ms. Blahunka informed Mr. Umthun that the students' plan at that time was to hold the celebration in the courtyard at the high school.

56.     Mr. Umthun had no concerns about the celebration nor the Southview students walking across the street to come to the high school to attend the celebration.

57.     Ms. Blahunka later informed Mr. Umthun that the students had decided to change the location of the celebration to the high school auditorium and in her classroom at the high school.

58.     Again, Mr. Umthun had no concerns about the celebration nor the Southview students coming to the high school to attend the celebration.

59.     On May 19, 2022, Ms. Blahunka emailed Mr. Umthun's secretary inquiring about the availability of the high school auditorium after school on May 23, 2022, for the GSA end-of-year celebration because the students wanted to perform on the stage.

60.     Mr. Umthun's secretary responded that the auditorium was open and ultimately reserved the space for the GSA celebration from 4 PM to 6 PM on May 23, 2022.

61.     The GSA student members planned the entire event themselves. The students wanted to have ice cream at the beginning of the celebration to allow for socializing between the two GSAs and then hold a youth-friendly drag show.

62.     Student, C.D., organized the drag show. C.D. is a drag performer and had participated in youth drag shows in the Des Moines metro area for about a year at the time of the GSA celebration.

63.     C.D. had recently been crowned the winner of the Iowa Youth Pride Pageant, a family-friendly drag show pageant competition, which had participants of all ages and was held in Des Moines in April 2022.

64.     C.D. invited two of the pageant participants—recent high school graduates themselves—to perform at the GSA celebration with him, both of whom had also performed in other youth drag shows over the previous year.

65.     On May 17, 2022, Ms. Bjorklund sent an email to the GSA student members about the celebration at the high school on May 23, 2022, and reminded them to arrange transportation from the high school at 5 PM or to walk across the street back to Southview if they needed to be picked up at the regular time of 4:30 PM (when GSA meetings would normally end at Southview).

66.     On May 23, 2022, before the celebration started, C.D. spoke with Ms. Blahunka and let her know that other two performers would be arriving after school and come into the public access doors to the high school auditorium. C.D. also played the songs that the performers planned to use in their acts for Ms. Blahunka who determined that the songs were appropriate for the students.

67.     The performers arrived at the high school after the school day had ended and they prepared themselves for their performances, utilizing the private dressing rooms that are normally used by students acting in the school plays and participating in show choir at the high school.

68.     After school on May 23, Ms. Bjorklund and the Southview students who wanted to attend the celebration walked across the street to the high school and all of the students arrived in Ms. Blahunka's classroom at approximately 4:15 PM.

69.     The students socialized and ate ice cream until approximately 5 PM, when the students voluntarily went to the auditorium to watch the drag performances.

70.     C.D. introduced each of the three performers.

71.     As her child was performing, C.D.'s parent attended the celebration to watch her child and took pictures of his performance and the event he worked so hard to organize.

72.     Each of the performers did two performances, dressed in gender non-conforming costumes, with the two male performers wearing multiple layers of tights and hip padding to give their body the appearance of the opposite sex. The performers wore full body jumpsuits, dance leotards, and shirts and pants. No one removed any clothing during the performances.

73.     The performers danced and lip sang to their selected songs on the stage while the students watched from the audience, with a few students going down to the orchestra pit to hand a dollar bill to performer C.D. during his final performance on the stage.

74.     The students in attendance cheered, clapped, and were all excited to be a part of this experience, many of the students even asked to take pictures with the performers in costume.

75.     At least one other teacher, who was not as closely associated with the GSA as they were not a student-invited guest like Mr. Hurley or a club sponsor like Ms. Bjorklund and Ms. Blahunka, stepped into the auditorium to watch the student performance, but this teacher did not receive the same punishment as the Plaintiffs.

76.     The Plaintiffs all cheered and clapped for the performers and vocally supported the young performers in expressing a part of the LGBTQ+ culture through their performances.

77.     The performers then shared with the students their experience as a LGBTQ+ student and talked about how finding supportive people in the community was very important to accepting and loving themselves.

78.     The students were appreciative to learn that others had similar struggles to their own and were thriving after high school; it was a very positive and affirming experience for the GSA students.

79.     After the performers finished their acts, they went back to the private dressing rooms and changed out of their costumes and into their street clothes.

80.    At no point during the celebration did anyone expose themselves to a student or do anything obscene, inappropriate, or engage in behavior that interrupted the educational environment at the school.

81.    The performers did dance moves that are seen all the time at Ankeny dance team or show choir performances. The performances were objectively similar to years of performances done by the "Spice Boys," all of whom were male student-athletes, not student members of the LGBTQ+ student club, dressed in female cheerleader sweaters and skirts, wigs, and makeup who performed dance routines at mandatory high school pep rallies. *See* Ankeny Spice Boys: https://www.youtube.com/watch?v=1jHps0BJnYY; https://www.youtube.com/watch?v=uDt0553Z2AY;https://www.youtube.com/watch?v=bu3sdO3-a8w.

82.    On May 24, 2022, after receiving bigoted complaints from community members who did not have children in attendance at the event, the superintendent sent an email to all parents falsely claiming that there had been an unauthorized performance and that the school was conducting an investigation into the GSA celebration. The District also posted similar statements and comments on social media.

83.    The District deviated from their normal media practice regarding inquiries about students or staff, which is to provide no comment.

84.    The next day, the students in the GSA club at the high school experienced violence and bullying. Other students bullied the GSA students while repeating the District's statements that the performance was unauthorized and therefore, not okay. Students also threw food at the GSA students at lunch while calling them derogatory names for members of the LGBTQ+ community.

85.    On June 6, 2022, multiple students attended a meeting of the Ankeny School Board to detail what had happened at the GSA's end-of-year celebration.

86.    These students, including several who attended the GSA end-of-year celebration, explained that:

a.    The event was optional, not required;

b.    Drag is not inherently sexual or dirty but is instead a form of artistic expression;

c.    Drag is merely a way to express how you feel and who you are;

d.    The event was meant to foster inclusivity and empower marginalized students;

e.    The event included *youth* drag performers who were fully clothed at all times;

f.    Students had a uniformly positive experience;

g.    There was nothing sexual, provocative, perverted, or inappropriate at the event; and

h.    The event provided a safe space for marginalized students to feel validated and accepted for who they are.

**Factual Allegations for Plaintiff Jill Bjorklund**

87.    Jill Bjorklund is a teacher within the District.

88.    Ms. Bjorklund is a vocal music director at Southview, and she directs Ankeny's award-winning eighth grade show choir.

89.    Ms. Bjorklund stepped in as faculty sponsor for Southview's GSA club after the permanent sponsor left for maternity leave.

90.    Ms. Bjorklund is also the mother of a transgender student who attends Ankeny Community School District, which gives her insight into the experiences of LGBTQ+ students and, in part, fosters her desire to serve as an advocate and safe adult in her school for these students.

91.     The District has employed Ms. Bjorklund since 2015 as a vocal music teacher. Ms. Bjorklund has been teaching for fifteen years.

92.     Ms. Bjorklund was not given any training regarding her role as a faculty sponsor for a student club.

93.     Ms. Bjorklund also served as an Instructional Leadership Team member, Curriculum Advisory Team member, and mentor to other teachers in the District.

94.     Prior to the events discussed in this complaint, Ms. Bjorklund's employment record at the District was spotless; she had no prior performance or disciplinary issues.

95.     On April 1, 2022, the administration at Southview called a student into the office for saying "Good morning guys and gals, and all my non-binary pals" while the student was doing morning announcements for the school. Administration told the student that what they had said was inappropriate and, in the future, they needed to leave out the "non-binary pals" portion.

96.     The student was very upset and reported to Ms. Bjorklund that they had been called into the office and felt as though they had been punished for recognizing non-binary students in the school.

97.     Ms. Bjorklund met with Southview's principal on April 4, 2022, to complain about this incident and the fact that she had witnessed the GSA being treated differently from other student groups in violation of the Equal Access Act multiple times throughout the school year.

98.     During the meeting, the principal told Ms. Bjorklund that she could not even help the GSA in any way, only be present at meetings, she was only permitted to unlock the classroom where the club met, be in the room, and lock the door when the meeting ends, a restriction that is not imposed on any other student club.

99.     Ms. Bjorklund also complained that no one from administration showed any concern or awareness that the students in the GSA would need to find a fill-in faculty sponsor while the regular sponsor was out on maternity leave, nor did administration help the students resolve this issue.

100.    After her meeting with the principal, Ms. Bjorklund escalated her complaints of discrimination and violation of the Equal Access Act on behalf of her students to the Chief Diversity Officer for the District and Chief Officer for Legal Affairs and Strategic Initiatives.

101.    On April 15, 2022, she informed the District that faculty supporting the GSA and the GSA club had been treated differently from other student clubs in violation of state and federal laws, shared the information she had shared and learned during her meeting with the principal, and provided a number of examples including:

      a.  GSA was only allowed to hang posters for their club and club events above designated water fountains within the school, while other student clubs were allowed to hang posters all around the school;

      b.  GSA was told to take down posters because they were too large and administration put limits on the size of posters that GSA could post, while other clubs were allowed to have posters of all sizes;

      c.  Administration had verbally reprimanded faculty supporting the GSA for forwarding a student drafted email from a GSA club member to all staff letting them know there were free stickers from the GSA in the teachers lounge for National Trans Day of Visibility for anyone to take, while other teachers including the activities director is permitted to send all-staff emails promoting the purchasing of club apparel for other student clubs;

d.  GSA was told they could not use the school's closed circuit television announcements or weekly announcement slide show to advertise club events, while other cubs are permitted to use both means of advertisement to the student body and the activities director even used the school's official activities twitter page to promote other student club events;

e.  GSA was not listed on the school's website with other student clubs, nor were they included in school newsletters or promotional materials with the other student clubs, despite the fact that repeated complaints were made to the activities director regarding the omission of GSA from these platforms.

102.  The District took no actions in response to these complaints, other than to propose a change to the policy regarding how much involvement faculty sponsors are permitted to have with helping students plan and run club events, which was never presented to the school board for approval.

103.  The District did not even take steps to provide the same notice of restrictions that the GSA was under to other faculty club sponsors.

104.  Shortly after making these complaints, Ms. Bjorklund walked across the street with the Southview GSA students that she had advocated for just weeks before to the high school and attended the May 23, 2022, GSA celebration as the faculty sponsor.

105.  Prior to attending the celebration, Ms. Bjorklund had spoken with Ms. Blahunka and knew that the activities director, Mr. Umthun, knew that the Southview kids were coming over to the high school after school for the joint celebration.

106.    The drag show was youth friendly; the performers were fully clothed in typical dance costumes at all times, the music selections were Broadway tunes and songs heard every day on the radio, and there was nothing sexual or provocative about their performances.

107.    Ms. Bjorklund did not censor the performers costumes because she observed they were appropriate dance costumes that did not violate the school dress code because she understood that the performers had the right to express their gender, gender identity, and sexual orientation without discrimination.

108.    The drag show concluded with a performance by C.D. of Barbara Streisand's "Don't Rain on My Parade."

109.    During this performance Ms. Bjorklund gave C.D. $1, which she had gotten from Mr. Hurley via hand-to-hand delivery while C.D. was performing to express that C.D. was doing a great job with his performance.

110.    After the performance concluded, Ms. Bjorklund informed students that they could take pictures with the performers if they were comfortable and wished to do so. She did not encourage or force any student to take pictures.

111.    Ms. Bjorklund did not post any pictures of students at the celebration on any social media platforms.

112.    At no time during the GSA celebration did Ms. Bjorklund witness any student in distress or discomfort.

113.    At no time during the GSA celebration did Ms. Bjorklund witness anyone touch the performers while they were performing.

114.    At no time during the GSA celebration did Ms. Bjorklund witness anything sexually suggestive or otherwise inappropriate.

115.    If Ms. Bjorklund had believed the event was dangerous or inappropriate, she would have immediately taken action to stop it.

116.    On May 24, 2022, a member of the public started sharing C.D.'s parent's social media posts of her child performing at the celebration.

117.    On May 25, 2022, Ms. Bjorklund was called into a virtual meeting with Defendant Graham and placed on immediate administrative leave pending an investigation of the GSA celebration, causing Ms. Bjorklund to the miss the final concert of her eighth grade choir which was held the next day.

118.    On May 26, 2022, Ms. Bjorklund had an investigatory meeting with Defendant Graham in the District main office, which began with Defendant Graham informing Ms. Bjorklund that the District's main concern was to investigate whether there was sexual obscenity at the celebration.

119.    In her investigatory meeting, Ms. Bjorklund confirmed that the performances were *not* risqué, obscene, suggestive, or inappropriate and were instead impactful and affirming.

120.    Ms. Bjorklund reported that the GSA celebration was a youth-friendly, family-friendly, and wholesome event.

121.    She explained that students viewed the event positively and that students applauded and smiled throughout.

122.    She reported that the performers' attire was in line with what she saw in other extra-curricular activities—including swimming, cheerleading, and wrestling—and what she saw just walking the halls during school hours on a normal day where it was not unusual to see student's bras and exposed parts of students' bottoms due to very short shorts.

123.    Critically, Ms. Bjorklund also confirmed that tipping is a normal and accepted part of drag shows.

124.    She explained that people tipped even at the youth drag shows she had attended and that the money was more like a prop in this context.

125.    Ms. Bjorklund said tipping was "a customary response" to a drag performance, akin to clapping.

126.    Ms. Bjorklund made it clear to the District that she was upholding the students' and performers' right to be free from discrimination, expressing that she would have violated the students' and performers' civil rights had she interfered with the performances or insisted that the performers change their attire because their costumes were those typically worn by members of the opposite sex.

127.    At the conclusion of the meeting, the District told Ms. Bjorklund she was not permitted to be on school grounds, attend any school sponsored events, or talk to any students, parents, or district employees, and Defendant Graham told her to ignore questions from students' parents and to make no comment on the investigation or her leave, preventing Ms. Bjorklund from speaking to witnesses for her civil rights claims.

128.    Days later, on June 1, 2023, Defendant Graham and the District summoned Ms. Bjorklund for another meeting, where Defendant Graham informed her that the District intended to file charges of ethical violations against her with the Iowa Board of Education Examiners ("BOEE").

129.    In that meeting, Ms. Bjorklund's principal, Chris Novak, informed Ms. Bjorklund and Defendant Graham that he had contacted all of the families that had children in attendance at

the celebration and 100% of the families were supportive of their child attending the celebration and had no complaints about Ms. Bjorklund.

130.    At that time, Defendant Graham told Ms. Bjorklund again that she was not permitted to be on school grounds, attend any school sponsored events, or talk to any students, parents, or district employees, which caused Ms. Bjorklund to miss the graduation parties of her students, prevented her from talking to students and families that reached out with concerns about how she was being treated, prevented her from conducting the necessary summer duties to prepare for the 2022-23 show choir season, including emailing chorographers and working with her co-worker to completely design the show, and caused isolation from her co-workers, all of which caused Ms. Bjorklund to experience significant emotional distress.

131.    On June 13, 2022, Ms. Bjorklund received a letter from the BOEE informing her that the District had, in fact, charged her with ethical violations for

a.  Failing to make reasonable effort to protect the health and safety of the student or creating conditions harmful to student learning under 282-25.3(6)(c);

b.  Intentionally disclosing confidential information including, but not limited to, unauthorized sharing of information concerning student academic or disciplinary records, health and medical information, assessment or testing results, or family income under 282-25.3(6)(h);

c.  Willfully or repeatedly departing from or failing to conform to the minimum standards of acceptable and prevailing educational practice in the state of Iowa under 282-25.3(8)(a); and

d.  Willfully or repeatedly failing to practice with reasonable skill and safety under 282-25.3(8)(b).

132.    The District claimed Ms. Bjorklund violated these ethical standards by transporting students "off campus" to watch "a drag show of two adults wearing drag."

133.    The District also alleged that multiple videos and pictures were taken of the event and shared on social media and that students and Ms. Bjorklund were in the social media posts, insinuating that Ms. Bjorklund herself had taken the pictures and posted them on social media.

134.    The letter informed Ms. Bjorklund that the BOEE had opened an investigation and that she had a right to present her version of the facts.

135.    The letter also informed Ms. Bjorklund that, if the BOEE found the allegations against her justified, it might take actions concerning her teaching license, including suspension or revocation.

136.    On August 5, 2022, the District notified Ms. Bjorklund that it had elected to move forward with disciplinary action even without a determination from the BOEE.

137.    As of that date, the District had determined that Ms. Bjorklund violated the three provisions it had cited in charging her by transporting students to an "off-campus event" without securing parent permission to have students "leave District property" and not determining if students in pictures taken at the celebration had permission to be included in pictures or videos.

138.    However, on December 7, 2022, the Southview activities director confirmed Ms. Bjorklund and her colleague that they did not need permission slips to take students across the street to the high school for a choral event because the high school is considered "on campus." The activities director also confirmed that numerous other student activities have students go back and forth between the high school and Southview without obtaining parent permission.

139.     All of the students who attended the GSA celebration were permitted to have pictures taken at school events and the pictures were taken and shared by a parent similar to numerous other school events.

140.     The District regularly takes pictures of large groups of students without first checking that the students in the pictures have permission to be included in pictures or videos, which the District posts on social media.

141.     Based on its determination that Ms. Bjorklund had violated District policy and her ethical duties, the District suspended Ms. Bjorklund without pay for the first five days of school.

142.     Importantly, Ms. Bjorklund was not suspended for the first five days of her contract for the 2022-23 academic year, but instead was required to work those days and her suspension only started on the first five school days, which meant her students, some of whom were in attendance at the celebration months earlier, would know of her discipline and understand that advocating on behalf of LGBTQ+ students would be actively discouraged by administration.

143.     Ms. Bjorklund was suspended from sponsoring any non-Schedule D clubs or activities for a one-year period.

144.     The District also issued a "Last Chance Agreement" that is now included in Ms. Bjorklund's personnel file.

145.     Under this Last Chance Agreement, any policy violation—no matter how minor or insignificant—can be used to terminate Ms. Bjorklund's employment at the District.

146.     Subject to these conditions, Ms. Bjorklund was permitted to return to work on August 30, 2022, with the knowledge that her every action would be scrutinized by the District in a way that it is not for her colleagues that had not outwardly expressed their support for LGBTQ+ students by attending the GSA celebration.

147.   On September 15, 2022, Ms. Bjorklund received notice from the BOEE. *See* Ex. 1.

148.   In that notice, the BOEE informed Ms. Bjorklund that it had dismissed the complaint against her because it "found that the evidence gathered in the investigation, including witness statements and the documentary evidence, does not create a reasonable ground for belief in the existence of facts warranting a hearing, and the board lacked probable cause to proceed with this matter." *Id.*

149.   The BOEE also stated: "The board found this was a district-sanctioned and approved event. If there was a district policy violated, then it is the responsibility of the [D]istrict to handle that violation. This did not rise to the level of an ethical violation." *Id.*

150.   However, the District had already disciplined and publicly humiliated Ms. Bjorklund in retaliation for her  her support and advocacy for her LGBTQ+ students, and for exercising her rights to free speech and association.

**Factual Allegations for Plaintiff Mollie Jo Blahunka**

151.   Mollie Jo Blahunka is a teacher within the District.

152.   Ms. Blahunka is an English teacher at Ankeny High School, and she also serves as the director of the high school drama department, which puts on a fall play, winter student-directed one act play, and spring musical.

153.   Ms. Blahunka is an openly queer woman.

154.   The District has employed Ms. Blahunka since 2019. Ms. Blahunka has been teaching for six years.

155.   Ms. Blahunka was not given any training regarding her role as a faculty sponsor for a student club.

156.    Prior to the events discussed in this complaint, Ms. Blahunka's employment record at the District was spotless; she had no prior performance or disciplinary issues.

157.    Ms. Blahunka attended the May 23, 2022, GSA celebration as the faculty sponsor.

158.    The drag show was youth friendly; the performers were fully clothed in typical dance costumes at all times, the music selections were Broadway tunes and songs heard every day on the radio, and there was nothing sexual or provocative about their performances.

159.    Ms. Blahunka did not censor the performers costumes because she observed they were appropriate dance costumes that did not violate the school dress code because she understood that the performers had the right to express their gender, gender identity, and sexual orientation without discrimination.

160.    The drag show concluded with a performance by C.D. of Barbara Streisand's "Don't Rain on My Parade."

161.    During this performance Ms. Blahunka, gave C.D. $1—which she had gotten from Mr. Hurley—via hand-to-hand delivery while C.D. was performing to express that C.D. was doing a great job with his performance.

162.    After the performance concluded, Ms. Blahunka informed students that they could take pictures with the performers if they were comfortable and wished to do so. She did not encourage or force any student to take pictures.

163.    Ms. Blahunka did not take any pictures of the students, and she did not post any pictures of students at the celebration on any social media platforms.

164.    At no time during the GSA celebration did Ms. Blahunka witness any student in distress or discomfort.

165.    At no time during the GSA celebration did Ms. Blahunka witness anyone touch the performers while they were performing.

166.    At no time during the GSA celebration did Ms. Blahunka witness anything sexually suggestive or otherwise inappropriate.

167.    If Ms. Blahunka had believed the event was dangerous or inappropriate, she would have immediately taken action to stop it.

168.    On May 24, 2022, a member of the public started sharing C.D.'s parent's social media posts of her child performing at the celebration.

169.    On the same day, administration came into Ms. Blahunka's eighth period class—in the middle of the class period—while she was actively teaching students (some of whom were members of the GSA and had been present at the end-of-year celebration) and she was informed that there were negative comments about the GSA celebration on social media and that she was going to be investigated.

170.    On May 25, 2022, Ms. Blahunka was called into a virtual meeting with Defendant Graham where she was placed on administrative leave pending an investigation of the GSA celebration and told that she was forbidden to talk to anyone including students, parents, and staff.

171.    On May 26, 2022, Ms. Bjorklund had an investigatory meeting with Defendant Graham in the District main office which began with Defendant Graham informing Ms. Blahunka that the District's main concern was to investigate whether there was sexual obscenity at the celebration.

172.    In her investigatory meeting, Ms. Blahunka confirmed that the performances were *not* risqué, obscene, suggestive, or inappropriate.

173.    Ms. Blahunka explained that, while she would not have chosen the outfits that some of the performers wore, there was nothing inappropriate about the costumes and that had she stopped the performers to censor their attire it would have restricted their self-expression as a member of the LGBTQ+ community, something she would not have done as a queer woman.

174.    Ms. Blahunka made it clear to the District that she was upholding the students' and performers' right to be free from discrimination, expressing that she would have violated the students' and performers' civil rights had she interfered with the performances or insisted that the performers change their attire because their costumes were those typically worn by members of the opposite sex.

175.    She explained that students viewed the event positively and that students applauded and smiled throughout.

176.    At the conclusion of the meeting, the District told Ms. Blahunka she was not permitted to be on school grounds, attend any school sponsored events, or talk to any students, parents, or district employees, and Defendant Graham told her to ignore questions from students' parents and to make no comment on the investigation or her leave, preventing Ms. Blahunka from speaking to witnesses for her civil rights claims.

177.    The District's restriction on Ms. Blahunka's speech also prevented her from assisting multiple drama students that had been selected to compete for the school in a drama competition and resulted in two of her students failing her class (a course required for graduation) because she was not able to assist them in the final days of the semester as she had planned so she could work with the students to complete the work necessary to obtain a passing grade.

178.    Days later, on June 1, 2023, Defendant Graham and the District summoned Ms. Blahunka for another meeting, where Defendant Graham informed her that the District intended to file charges of ethical violations against her with the Iowa BOEE.

179.    In that meeting, Defendant Graham admitted that she found no evidence that the children were exposed to sexual obscenity but that she was moving forward with disciplinary actions nonetheless because Ms. Blahunka had allowed students to watch a drag show.

180.    Defendant Graham also told Ms. Blahunka that she was not permitted to be on school grounds, attend any school sponsored events, or talk to any students, parents, or district employees, which caused Ms. Blahunka to miss graduation and graduation parties for her students, prevented her from talking to students and families that reached out with concerns about how she was being treated, prevented her from conducting the necessary summer duties to prepare for the 2022-23 fall student play production, including reviewing scripts and contacting individuals to obtain the performance rights and working with her co-worker to plan play auditions, prevented her from cleaning out the drama supply room as required by fire code, and caused isolation from her co-workers, all of which caused Ms. Blahunka to experience significant emotional distress.

181.    On June 13, 2022, Ms. Blahunka received a letter from the BOEE informing her that the District had, in fact, charged her with ethical violations for

e.   Failing to make reasonable effort to protect the health and safety of the student or creating conditions harmful to student learning under 282-25.3(6)(c);

f.   Intentionally disclosing confidential information including, but not limited to, unauthorized sharing of information concerning student academic or disciplinary records, health and medical information, assessment or testing results, or family income under 282-25.3(6)(h);

g.  Willfully or repeatedly departing from or failing to conform to the minimum standards of acceptable and prevailing educational practice in the state of Iowa under 282-25.3(8)(a); and

h.  Willfully or repeatedly failing to practice with reasonable skill and safety under 282-25.3(8)(b).

182.  The District claimed Ms. Blahunka violated these ethical standards by planning the GSA event and permitting students to watch "a drag show of two adults wearing drag," allowing two visitors to attend the event without following district protocols for having visitors at an after-school event, and allowing staff to step into the auditorium while their student, C.D., was performing.

183.  The District also alleged that multiple videos and pictures were taken of the event and shared on social media and that students and Ms. Blahunka were in the social media posts, insinuating that Ms. Blahunka herself had taken the pictures and posted them on social media.

184.  The letter informed Ms. Blahunka that the BOEE had opened an investigation and that she had a right to present her version of the facts.

185.  The letter also informed Ms. Blahunka that, if the BOEE found the allegations against her justified, it might take actions concerning her teaching license, including suspension or revocation.

186.  On August 5, 2022, the District notified Ms. Blahunka that it had elected to move forward with disciplinary action even without a determination from the BOEE.

187.  As of that date, the District had determined that Ms. Blahunka violated the three provisions it had cited in charging her for allowing visitors to attend an after-school event without presenting a government-issued ID, not determining if students in pictures taken at the celebration

had permission to be included in pictures or videos, and for not stopping the performances to force the performers to change their costumes.

188.     Notably, only Ms. Blahunka, a queer woman, was punished for not forcing the performers to change into different costumes despite the fact that their costumes were not obscene.

189.     Parents very frequently attend after school events, including practices that are not open to the public when no one is in the front office of the school to check those individuals' IDs. Parents also take pictures at those events of their child and their child's classmates, often posting those pictures on social media.

190.     Other student clubs have invited public speakers to address the student members after school, in person, and have never had to have guests present a government-issued ID. None of these clubs nor their faculty sponsors have been reprimanded for allowing visitors to attend an after-school event without presenting a government-issued ID.

191.     All of the students who attended the GSA celebration were permitted to have pictures taken at school events, and the pictures of the GSA celebration were taken and shared by a parent similar to numerous other school events.

192.     The District regularly takes pictures of large groups of students without first checking that the students in the pictures have permission to be included in pictures or videos, which the District posts on social media.

193.     Students are permitted to wear clothing that reveals their stomachs, bras, and the bottom portion of their buttocks during the school day all the time, and neither teachers nor administrators force the students to change clothing unless it has profanity or hate speech on it. The school's dress code does not require or police modesty of dress.

194.    Based on its determination that Ms. Blahunka had violated District policy and her ethical duties, the District suspended Ms. Blahunka without pay for the first three days of school.

195.    Importantly, Ms. Blahunka was not suspended for the first three days of her contract for the 2022-23 academic year, but instead was required to work those days and her suspension only started on the first three school days, which meant her students, some of whom were in attendance at the GSA celebration months earlier, would know of her discipline and understand that advocating on behalf of LGBTQ+ students would be actively discouraged by administration.

196.    Ms. Blahunka was also suspended from sponsoring any non-Schedule D clubs or activities for a one-year period.

197.    The District also issued a "Last Chance Agreement" that is now included in Ms. Blahunka's personnel file.

198.    Under this Last Chance Agreement, any policy violation—no matter how minor or insignificant—can be used to terminate Ms. Blahunka's employment at the District.

199.    Subject to these conditions, Ms. Blahunka was permitted to return to work on August 26, 2022, with the knowledge that her every action would be scrutinized by the District in a way that it is not for her colleagues who had not outwardly expressed their support for LGBTQ+ students by attending the GSA celebration.

200.    On September 15, 2022, Ms. Blahunka received notice from the BOEE. *See* Ex. 1.

201.    In that notice, the BOEE informed Ms. Blahunka that it had dismissed the complaint against her because it "found that the evidence gathered in the investigation, including witness statements and the documentary evidence, does not create a reasonable ground for belief in the existence of facts warranting a hearing, and the board lacked probable cause to proceed with this matter." *Id.*

202.    The BOEE also stated: "The board found this was a district-sanctioned and approved event. If there was a district policy violated, then it is the responsibility of the [D]istrict to handle that violation. This did not rise to the level of an ethical violation." *Id.*

203.    However, the District had already disciplined and publicly humiliated Ms. Blahunka, for her support and advocacy for her LGBTQ+ students and for exercising her rights to free speech and association.

**Factual Allegations for Plaintiff PJ Hurley**

204.    Patrick "PJ" Hurley is a teacher within the District.

205.    Mr. Hurley is an openly gay man.

206.    Throughout his life, Mr. Hurley has lost jobs and has suffered physical and verbal abuse because he is gay.

207.    The District has employed Mr. Hurley since 2012 in various teaching roles, which has at times involved enduring bigoted remarks from co-workers and feelings of exclusion in the workplace, but he is passionate about education and providing special education services to his students.

208.    Mr. Hurley assumed his current position in the 2018-19 academic year.

209.    From that date to the present, Mr. Hurley has provided special education services to pre-kindergarten students at the Terrace Learning Center.

210.    In October 2020, Mr. Hurley applied to be the Assistant High School Drama Director.

211.    As the Assistant Drama Director, Mr. Hurley helped direct the fall play and spring musical at Ankeny High School in the 2020-21 and 2021-22 academic years.

212.    Mr. Hurley recently served on the District's Diversity Equity Inclusion Leadership Team ("DEILT") Committee, which was formed in response to an audit showing that the District lacked diversity and had issues with bullying minority students, including those in the LGBTQ+ community.

213.    The DEILT Committee created a framework for the District to promote and ensure diversity, equity, and inclusion.

214.    With two other committee members, Mr. Hurley presented the proposed framework to the District's School Board on May 16, 2022.

215.    The School Board approved the proposed framework, which is currently being used in the District.

216.    Prior to the events discussed in this complaint, Mr. Hurley's employment record at the District was spotless; he had no prior performance or disciplinary issues.

217.    On approximately May 22, 2022, an openly gay student—C.D.—invited Mr. Hurley, a role model to C.D., to attend an end-of-year celebration hosted by the Ankeny High School GSA.

218.    Prior to this invitation, Mr. Hurley's only knowledge of the GSA club came from sewing in the drama shop while the GSA conducted meetings in the next room.

219.    C.D.'s invitation, which came during a graduation party, included an explanation that the year-end celebration would have ice cream and cookies and would include drag performances, including one by C.D. himself.

220.    C.D., who had recently won the Iowa Youth Pride Pageant, proudly informed Mr. Hurley that he had organized the entire drag show himself. The student was very excited to

share with his peers the activity that had led to C.D. finally feeling comfortable with who he was as a queer person.

221.    Mr. Hurley had no role in planning, organizing, or conducting the GSA's end-of-year celebration.

222.    Mr. Hurley had no input in or control over the performances at the GSA's end-of-year celebration.

223.    On May 23, 2022, Mr. Hurley attended the performances at the GSA's end-of-year celebration.

224.    As C.D. had suggested, the celebration included a drag show and performances by three separate performers.

225.    The drag show was youth friendly; the performers were fully clothed in typical dance costumes at all times, the music selections were Broadway tunes and songs heard every day on the radio, and there was nothing sexual or provocative about their performances.

226.    Mr. Hurley did not censor the performers costumes because he observed they were appropriate dance costumes that did not violate the school dress code because he understood that the performers had the right to express their gender, gender identity, and sexual orientation without discrimination.

227.    The drag show concluded with a performance by C.D. of Barbara Streisand's "Don't Rain on My Parade."

228.    C.D.'s performance was met with applause and cheering from those in attendance.

229.    As a fan of Barbara Streisand, Mr. Hurley enjoyed C.D.'s performance and thought it appropriate—and in keeping with drag-show etiquette—to tip C.D.

230.     Accordingly, Mr. Hurley walked toward the stage during C.D. performance and handed C.D. $1.

231.     Mr. Hurley did not touch C.D., nor did he place money, or anything else, in C.D.'s clothing or on his person.

232.     The exchange was hand-to-hand and lasted approximately two seconds.

233.     Mr. Hurley then handed $1 each to two adults—Plaintiffs Mollie Jo Blahunka and Jill Bjorklund—and two students who asked if Mr. Hurley had any extra dollars so that they could also tip C.D. for his incredible performance.

234.     Those four individuals, and others, then gave C.D. tips for his performance.

235.     C.D. collected all tips by hand-to-hand exchanges during his performance, dropping the bills on stage as he switched a black umbrella for a rainbow one near the finale.

236.     After the performance concluded, as Ms. Blahunka and Ms. Bjorklund informed students that they could take pictures with the performers if they were comfortable and wished to do so, Mr. Hurley left the auditorium.

237.     At no time during the GSA celebration did Mr. Hurley witness any student in distress or discomfort.

238.     At no time during the GSA celebration did Mr. Hurley witness anyone touch the performers while they were performing.

239.     At no time during the GSA celebration did Mr. Hurley witness anything sexually suggestive or otherwise inappropriate.

240.     If Mr. Hurley had believed the event was dangerous or inappropriate, he would have immediately taken action to stop it.

241.   On May 25, 2022, Mr. Hurley overheard staff members discussing the GSA celebration.

242.   That same day, he met with Principal Amy Kolln and informed her of his attendance at the GSA end-of-year celebration.

243.   At that time, Principal Kolln expressed no concern with Mr. Hurley's attendance or participation in the event.

244.   However, in the middle of the school day, at approximately 11:00 AM on May 27, 2022, Mr. Hurley was called into a virtual meeting with Defendant Graham and placed on administrative leave pending an investigation of the GSA celebration.

245.   May 27, 2022, was the last day of school for Mr. Hurley's students, and a very important day for pre-kindergarten students and teachers to wrap up their year, prepare the students and their families for summer—where there will be an interruption in special education services for some students—and say goodbye.

246.   Because he was unceremoniously placed on administrative leave in the middle of the last day of school, Mr. Hurley and his students were denied the opportunity to conclude their year together and to say goodbye to each other.

247.   Mr. Hurley's abrupt suspension on the last day of school for attending an event to support and affirm LGBTQ+ students traumatized Mr. Hurley and, his classroom full of his three-, four-, and five-year-old students.

248.   At the conclusion of this meeting, Principal Kolln told Mr. Hurley not to speak to anyone and later told a staff member not to speak to Mr. Hurley.

249.   The next week, on May 31, 2023, Mr. Hurley attended an investigative meeting with Defendant Graham.

250.    To open the meeting, Defendant Graham informed Mr. Hurley that the District's goal was to see things from his perspective and understand exactly what happened.

251.    During the meeting, Mr. Hurley explained that he was an assistant drama director and had been invited to the end-of-year GSA celebration by C.D. at another student's graduation party.

252.    Mr. Hurley explained that he attended only some of the event, sat alone, and watched the performances.

253.    He explained that the show included three drag performers, each of whom performed twice, and that the performers shared their personal experiences in school as a queer youth with those in attendance after their performances.

254.    Defendant Graham asked Mr. Hurley where on the student, C.D.'s body he placed the $1 bill.

255.    Mr. Hurley explained that it is part of drag-show etiquette to hand $1 bills to performers and that this practice is common, accepted, and well-known in the community.

256.    At the conclusion of the meeting, the District told Mr. Hurley he was not permitted to be on school grounds, attend any school sponsored events, or talk to any students, parents, or district employees and Defendant Graham told him to ignore questions from students' parents and to make no comment on the investigation or his leave, preventing Mr. Hurley from speaking to witnesses for his civil rights claims.

257.    Days later, on June 2, 2023, Defendant Graham and the District summoned Mr. Hurley for another meeting, where Defendant Graham informed him that the District intended to file charges of ethical violations against him with the Iowa BOEE.

258.    In particular, the District intended to file charges related to his professional conduct and appearance.

259.    At that time, Ms. Graham told Mr. Hurley that he was not permitted to be on school grounds, attend any school sponsored events, or talk to any students, parents, or district employees, which caused Mr. Hurley to miss graduation parties of his students, prevented him from talking to students and families that reached out with concerns about how he was being treated, and caused isolation from his co-workers, all of which caused Mr. Hurley to experience significant emotional distress.

260.    In response, Mr. Hurley asked "if I didn't hand those dollar bills, would I still be in the same spot?"

261.    Ms. Graham's answer was clear and unequivocal: "No."

262.    This response made clear that Mr. Hurley, a gay man, was being punished for nothing more than expressing his support for the LGBTQ+ affirming student performance by tipping that student $1.

263.    Mr. Hurley pointed out that "teachers give out money to kids all the time."

264.    Ms. Graham did not disagree, responding: "The context of how you were giving it out is unprofessional, and that's the issue with this situation."

265.    Ms. Graham also informed Mr. Hurley that it would await the BOEE's conclusion and use that determination as an input for its own decision regarding whether and how to discipline Mr. Hurley for his involvement in the GSA celebration.

266.    During the June 2 meeting, Defendant Graham provided Mr. Hurley with a letter continuing his administrative leave.

267.     That letter informed Mr. Hurley that the District would file a complaint with the BOEE related to conduct and appearance.

268.     On June 13, 2022, Mr. Hurley received a letter from the BOEE informing him that the District had, in fact, charged him with ethical violations for

  i.   Failing to make reasonable effort to protect the health and safety of the student or creating conditions harmful to student learning under 282-25.3(6)(c);

  j.   Willfully or repeatedly departing from or failing to conform to the minimum standards of acceptable and prevailing educational practice in the state of Iowa under 282-25.3(8)(a); and

  k.   Willfully or repeatedly failing to practice with reasonable skill and safety under 282-25.3(8)(b).

269.     The District claimed Mr. Hurley violated these ethical standards in a single way: He "attended a drag performance" and, "in response to the performance, he handed the student a dollar bill."

270.     The letter confirms that "Mr. Hurley also handed out four other dollar bills, two dollar bills to adults and two dollar bills to students attending the drag show."

271.     It then states that "[t]hose four individuals then handed the money to the student performing drag."

272.     No one ever claimed that Mr. Hurley violated any policy or ethical duty in any other way.

273.     The letter informed Mr. Hurley that the BOEE had opened an investigation and that he had a right to present his version of the facts.

274.    The letter also informed Mr. Hurley that, if the BOEE found the allegations against him justified, it might take actions concerning his teaching license, including suspension or revocation.

275.    On August 5, 2022, the District notified Mr. Hurley that it had elected to move forward with disciplinary action even without a determination from the BOEE.

276.    As of that date, the District had determined that Mr. Hurley violated the three provisions it had cited in charging him by "not us[ing] appropriate professional discretion in distributing money to students at the end-of-year event."

277.    Again, there was no other conduct alleged to have violated any policy or ethical duty.

278.    Based on its determination that Mr. Hurley had violated District policy and his ethical duties, the District suspended Mr. Hurley from sponsoring any non-Schedule D clubs or activities for a one-year period.

279.    The District also issued a "Last Chance Agreement" that is now included in Mr. Hurley's personnel file.

280.    Under this Last Chance Agreement, any policy violation—no matter how minor or insignificant—can be used to terminate Mr. Hurley's employment at the District.

281.    Subject to these conditions, Mr. Hurley was permitted to return to work.

282.    On September 15, 2022, Mr. Hurley received notice from the BOEE. *See* Ex. 1.

283.    In that notice, the BOEE informed Mr. Hurley that it had dismissed the complaint against him because it "found that the evidence gathered in the investigation, including witness statements and the documentary evidence, does not create a reasonable ground for belief in the

existence of facts warranting a hearing, and the board lacked probable cause to proceed with this matter." *Id.*

284.    The BOEE also stated: "The board found this was a district-sanctioned and approved event. If there was a district policy violated, then it is the responsibility of the [D]istrict to handle that violation. This did not rise to the level of an ethical violation." *Id.*

285.    The District took adverse employment action against Mr. Hurley because of his support and advocacy for LGBTQ+ students, and for exercising his rights to free speech and association.

**COUNT I**
**INTERFERENCE WITH SPEECH IN VIOLATION OF THE FIRST AMENDMENT**
**UNDER 42 U.S.C. § 1983**
**(Against All Defendants)**

286.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

287.    Plaintiffs have a fundamental right to associate and express Plaintiffs' views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution and enforceable pursuant to 42 U.S.C. § 1983.

288.    Through verbal waring and in the letter placing the Plaintiffs on administrative leave, Defendants prevented Plaintiffs from speaking freely regarding the discrimination they faced and prohibited them from speaking to anyone about anything related to school under threat that violating the prohibition would result in further disciplinary actions.

289.    Defendants' actions violated Plaintiffs' rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiffs' ability to associate freely in public and express Plaintiffs' views and support for the LGBTQ+ community.

290.    Speech and expression related to gender identity and/or sexual orientation, such as celebrating a cornerstone of queer culture, is protected First Amendment activity.

291.    Discrimination against speech based on its content and viewpoint is a violation of the First Amendment. Efforts to suppress speech based on the government's opposition to the speaker's views or beliefs are unconstitutional absent narrow tailoring in service of a compelling justification.

292.    "[I]mplicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

293.    Discrimination against freely associating with a protected association, the GSA student-club, is unconstitutional absent a compelling state interest.

294.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiffs' First Amendment rights.

295.    As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiffs have in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost wages; and lost enjoyment of life.

296.    At all times described herein, Defendants are state actors operating under color of state law.

297.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount which will fully and fairly compensate them for their injuries and damages, for emotional distress, for interest as allowed by law, for attorney's fees, for the costs of this action;

for equitable relief adequate to prevent further violation of Plaintiffs' civil rights; and for such

other relief as may be just in the circumstances and consistent with the purpose of the United States

Constitution.

## COUNT II
### RETALIATION IN VIOLATION OF THE FIRST AMENDMENT
### UNDER 42 U.S.C. § 1983
### (Against All Defendants)

298.   Plaintiffs reallege the above paragraphs as if fully set forth herein.

299.   Plaintiffs were engaged in lawful First Amendment conduct of free speech and

assembly.

300.   Persons who through their words and actions support the performers at a drag show

are exercising their right to publicly express their views on that art form and the LGBTQ+

community in general.

301.   As noted above, tipping is a normal practice within the LGBTQ+ community and

is an expression and support for drag performers.

302.   Plaintiffs faced discipline and retaliation for exercising their right to express

support for a drag performer, which is a violation of their civil rights under the Untied States

Constitution.

303.   Plaintiffs were placed on administrative leave in retaliation for exercising their right

to express support for the drag performers and the LGBTQ+ community.

304.   In the letter placing the Plaintiffs on administrative leave, Defendants retaliated

against Plaintiffs for exercising their right to free speech and threatened that further support,

expression, and/or assembly would result in further disciplinary actions.

305.   Defendants' conduct would chill a person of ordinary firmness from continuing to

engage in lawful First Amendment activity of free speech and assembly.

306.    Defendants acted in retaliation against Plaintiffs, and for the purposes of deterring Plaintiff from exercising Plaintiffs' rights under the First Amendment to free speech and assembly.

307.    Defendants acted with the intent to suppress Plaintiff's speech because of its content and in particular because it was supportive of LGBTQ+ students and of drag performances.

308.    At all relevant times, Defendants were acting under the color of law and the acts of Defendants described herein were intentional, wanton, malicious, and/or were callously indifferent to the rights of Plaintiffs, thus entitling Plaintiffs to an award of punitive damages against Defendants.

309.    As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiffs have in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost wages; and lost enjoyment of life.

310.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount which will fully and fairly compensate them for their injuries and damages, for emotional distress, for interest as allowed by law, for attorney's fees, for the costs of this action; for equitable relief adequate to prevent further violation of Plaintiffs' civil rights; and for such other relief as may be just in the circumstances and consistent with the purpose of the United States Constitution.


## JURY DEMAND

**COMES NOW** the Plaintiffs and hereby request a trial by jury in the above-captioned matter.

Respectfully Submitted,

BAILEY GLASSER, L.L.P.
*/s/ Lori A. Bullock*
Lori Bullock AT0012240
309 E 5th Street, Suite 202B
Des Moines, Iowa 50309
Telephone: (515) 416-9051
lbullock@baileyglasser.com

***ATTORNEY FOR PLAINTIFFS***